The next case on the calendar is Perkins v. Commissioner of Internal Revenue. May it please the Court. The issue before this Court is one of first impression. The Congress intends to give the Commissioner the power to tax Alice Perkins, an enrolled member of the Seneca Nation of Indians, for income she derives from the mining and selling of sand and gravel from the treaty protected lands of the Seneca Nation. Now of course summary judgment was granted to the government in this case, so the standard of review is one of de novo. But this Court must apply the liberal canons of construction which are applicable in interpreting treaties. That liberal canon construction has been reinforced by the United States Supreme Court last year, Herrera v. Wyoming, in which it said that treaties must be interpreted in light of the and any ambiguities resolved in favor of the Indians. That is contrary to the position that the Commissioner has taken in their brief, saying that you do not look to the intents of Congress or to the party. The words of an Indian treaty must be read, not in accordance to how they would be understood by a learned tax lawyer, but as they've been understood by an Indian, with doubtful expressions to be reviewed in favor of the Indians. In that regard, the Court is to review the historic context, the negotiations, the practical construction adopted by the parties. In the 236 years that the United States government has entered into treaties with the Seneca Nation, those series of treaties must be read in parte material, together and in harmony with one another. Let's turn to the words of the two treaties which are at issue in this case. 226 years ago, the Canandaigua Treaty Excuse me, you have one more minute of your initial three. Thank you. The Canandaigua Treaty stated that the land from which this sand and gravel was mined was the property of the Seneca Nation, and that they agreed the United States not to disturb the Seneca Nation or their friends united thereon, residing thereon or united with them in the free use and enjoyment of those lands. In 1842, the United States government promised again that those lands would not be subject to taxation or assessment for any purpose. And they stated in the 1842 treaty that the occupation and enjoyment of the Allegheny Reservation would continue with the same rights that existed prior to any indenture that was given to the Ogden Land Company. The historic context of these treaties must be reviewed. The first treaty was three years before the ratification of the Constitution. The Constitution, which gave plenary power to the federal government over Indian affairs, that declared federal treaties to be the supreme law of the land, and which limit the power in 1787 to the federal government raising taxes based upon a direct tax, a proportion among the several states based on a census which would exclude Indians not taxed. In 1856, the United States Supreme Court and Fellows versus Blackstone found that John Blackstone, a member of the Tonawanda had rights under the Canandaigua Treaty that when he fought the removal by Joseph Fellow, a member of the Ogden Land Company who tried to force him from his land and his sawmill. There, the United States Supreme Court said there was no remedy available and that the Canandaigua Treaty protected the individual Indian, Mr. Blackstone. Can I ask, Ms. Murphy, let's assume for the moment that we agree with you that these treaties create exemptions for taxes on land read together. Your client didn't own the possessory interest to use the surface of the land from which the gravel was taken. What difference does that make to the result here? Your Honor, it makes no difference. As we stated in our brief, Alice Perkins had a superior possessory interest in the land, not only the surface but the subsurface land superior to all those but the Seneca Nation. As a member of the Seneca Nation and united with them, united because she follows the custom laws and tradition, the Seneca Nation gave her permission to extract that gravel from that land to have the free use and enjoyment of those subterranean rights and for exchange of royalties that were paid to the Seneca Nation. The fact is, no member... How does the Seneca Nation's right to do that, their free use and enjoyment of their land and their ability to transfer a certain interest in the land to Ms. Perkins or to others who then transfer it to her, translate into the exemption of Ms. Perkins' removal of something from the land and then her transporting it off reservation land or sales to others and deriving income therefrom? First of all, Your Honor, the transportation of that off the territory is certainly not established in the record, but most importantly... And I misspoke, I apologize to that. Just her removal of it and her sale of it wherever it lands, wherever it ends up. That's right. Your Honor, I think it's because you have to look to the liberal construction which are given to the treaties. It doesn't impair the Senecas from entering into lease relationships or divesting themselves of internal rights, but that doesn't impair them in any way, shape, or form, does it? No, I agree with you. And there's no tax liens. Any tax liens that might arise with regard to the taxability of Ms. Perkins' income don't attach to any lands of the Senecas, do they? No, that's also correct, Your Honor. So there's no relationship between the taxing and the free use and enjoyment of the land by the Senecas. They're free to lease the land. In fact, the Senecas can lease the land out to non-Senecas, correct? Yes, they can. The city of Salamanca sits on Seneca land and it's entirely leased out, isn't it, to non-Native Americans? Absolutely, Your Honor. But I think the point that is missing from your analysis is the provision of the Canandaigua Treaty and the meaning of the phrase, and their Indian friends residing thereon and united with them. Excuse me. You have one more minute of your total time. Okay. Well, indeed, Mr. Jimmerson divested his interest in the service rights to Ms. Perkins, didn't he? Yes, he did. So Mr. Jimmerson and I don't know if Mr. Jimmerson derived income from it, but the issue of the taxability of any income he might have derived from the sale of those rights or that, that's not before us. And that would be I would think, different in kind from what Ms. Perkins did, wouldn't it be? Well, Your Honor, I think what the important thing here is every member of this nation... What if Ms. Perkins had been a non-Native? Because it says Indians and their friends. Could that include non-Native peoples? Your Honor, that's not an issue that I would argue because it's not applicable to this case. That's not the facts of this particular case. Well, I understand it's not the facts of this case, but I have to understand what the language means, and so I'm giving you a hypothetical and asking you to answer it. If a non-Native if Ms. Perkins were not a Seneca, would her income be taxable in your view? In my view, this court could rule that the language is limited to enrolled members of the Seneca Nation who resides on their land and who adhere to the custom laws and tradition of the nation as determined by the nation itself. This court could narrowly make that ruling. And whether a court in the future would expand it, that would be up to their interpretation. But here, it is very looking to the Indian friends. She is an Indian. She is an enrolled member, a member of the nation. And nation's rights are rights that are enjoyed by their people. How does a nation enjoy rights if it's not enjoyed by their people? This notion that her rights are limited because her rights belong to the nation, to me, is one that ignores what governments are to begin with. Our own Constitution begins with the phrase, we the people of the United States. In 1863, when the governor of the Gettysburg Direct, he described our own government as a government, he described in the Gettysburg address that we are a government of the people, by the people, and for the people. How is it that these treaties are not being interpreted that the rights and the protections, the rights and enjoyment to use those lands belong to the Seneca people? In the 1842 treaties, they made specific references to the rights to use those lands, to stay and remain on those lands until they are removed. And that referred to Seneca, not the Seneca nation, to Seneca, a word that would have... I agree with you. The 1842 treaty is far more problematic in my mind in terms of understanding what the rights are here than the treaty of Canandaigua, because the 1842 treaty was a treaty that the Seneca nation was experiencing with regard to the state and claims that had been resolved by Massachusetts by the sale to Ogden and fellows. And then the state's attempt to pay for roads or other improvements that occurred on lands that were Seneca lands. The Senecas had the option to leave those lands, but they could stay if they wished to do so. And that's the case that you mentioned earlier. And so when you look at the Canandaigua treaty, when you talk about Indian friends and you interpret it in the way that the government would have us interpret it, they would talk about people who were maybe Hurons or members of the Erie who became part of the Seneca nation through the process of adoption, would have greater rights than those whose bloodline originated with the Seneca nation. Those Indian friends include an enrolled member like Alice Perkins. She's the person who has the free use and enjoyment of land based on what her sovereign government, the Seneca nation, has given to her under their laws. She has the right to use not only the surface but the subsurface land. And her right of possession can come from whether she owes an allotment that started with the Seneca passed through quick claim deeds or by a lease given to her by another enrolled Seneca. But her rights flow from the fact that she is a enrolled Seneca. The 1842 treaty is not limited to the conflict. It may be the circumstances that once again brought the parties to the table in 1842 to come with yet another treaty, but it's not limited. There is nothing in the language that limits that taxation to state taxation. Your time has expired. You can choose to use some of your rebuttal time at this point. Your Honor, I will reserve my time for rebuttal. Thank you. We'll hear from the Commissioner. May it please the Court, Jacob Christensen for the Commissioner. The tax court correctly held that neither the Canandaigua treaty nor the 1842 treaty created an exemption for Alice Perkins so that she would not have to pay any tax on the gravel income that she earned from mining on Seneca Nation land under a tribal mining permit. I'd like to focus on the questions by the Court that distinguish between a tax on the land on one hand and tax on income derived from the land. That's an important distinction that the Supreme Court has established. The Supreme Court has recognized in the Mescalero case that we cited that absent clear statutory guidance, courts ordinarily will not imply tax exemptions for income simply because the land from which it is derived is itself exempt from tax. So here we have the 1842 treaty that unambiguously precludes only a tax on the Seneca Nation's land but does not extend to income derived from the land. And that's important because this notion that the Perkinsons are relying on, that income derived from the land is exempt, really is tied to the General Allotment Act and the Supreme Court's decision in Capamon. In that case where the Supreme Court held that not only would a tax on land be prohibited but also income derived therefrom and the Court determined that a contrary holding would have frustrated Congress's purposes in the General Allotment Act. Of course the General Allotment Act does not apply here and there is no precedent for extending it. The standard under the General Allotment Act for income derived from land, there is no precedent for extending that to other contexts that don't involve the General Allotment Act or an act with similar language, which is what the Perkinsons are advocating here. You have one more minute of your initial three. And the other reason that this reliance on income derived from the land, which is a standard under the General Allotment Act, is a poor analogy for the Perkinsons here, is because even in General Allotment cases where the Indian does not own the allotted land, where the land has been allotted it's either common tribal land or land allotted to another Indian, the courts have consistently rejected claims for tax exemption in that situation, which is what we have here. So that's another reason that the Perkinsons' reliance on, by analogy on these General Allotment cases and specifically on this idea that income derived from the land is exempt, is misplaced. The standard... The last argument you made then is an argument that Janice Crowe might be situated differently than Ms. Perkins, if I'm understanding it correctly. I think that's absolutely true, Your Honor. That here, the Perkinsons, their only interest in the land here was a mining permit. They were a licensee and as I said, in the Eighth Circuit case, Holt v. Commissioner, we had the same situation. The Indian in that case held a grazing permit on tribal land and the court held that the income from the Indian's cattle operation was subject to federal income tax, rejecting the taxpayer's argument that simply because the income was derived from tribal land that it was exempt. And also rejecting the Indian's argument in that case that he was somehow a co-owner of the land simply because he was a member of the tribe. Similar argument to what the Perkinsons are making here. And again, that's the Eighth Circuit's decision in Holt v. Commissioner. As the court questioned earlier, it's also important to recognize what's not an issue. What's not an issue is whether the royalty income that the Perkinsons paid to the tribe for mining gravel is subject to tax. That would be a separate issue. Tribes generally are exempt from federal income tax. But in the Supreme Court's decision, Chateau v. Burnett makes clear that even income that a tribe generates, once it's distributed to the individual tribe members, then it's taxable to the tribe members as individuals. So that's the case in Chateau v. Burnett, a 1931 case from the Supreme Court that we've decided. So even income received by the tribe that's then distributed to the members of the tribe is taxable. Here, all we're talking about is the personal income of the Perkinsons. This income did not, it wasn't tribal income. It didn't benefit the tribe in any way. And the tax court correctly held that the Perkinsons' personal income was subject to federal income tax. As I said, it would be a different case if an issue here were the royalties paid to the, whether the Seneca tribe is taxable on those royalties. Very different case. So it does make a difference that the Perkinsons didn't even have any ownership interest in the lands at issue here. Let me go back to my colleague's question about the 1842 treaty. I mean, I understand one of your arguments is it doesn't confer any individual rights, and that any exemption would run only to the nation as a whole. You have other arguments that say there is no exemption. But just on the individual rights question, the treaty does begin by, it notes that the rights belong to the nation, but also allows for the allocation of income from the sales of land to be allocated based on the proportion of individual Indians remaining in New York as compared to those who were moved west, if I understand. So money, so it contemplated payments to individuals. And as your adversary points out, it's hard to, you know, the members of a nation are those who enjoy the benefits of the rights afforded to a nation. So isn't at least that a contextual clue that these interests might run to individuals? I think it actually points the other way here, and here's why. So help me understand, yeah. So the 1842 treaty, well the 1838 treaty and then again the 1842 treaty divided up the purchase price into two categories. The first category was $100,000 or so that was paid for the land itself. And that was to be paid to the tribe. And then the second category of the purchase price was paid to Indians who had improvements on the land. And so the money that went to individual Indians was not for the land itself, but it was for improvements that had been constructed on the land. But when we come to Article 9, which is the provision here, the protection that's granted is a protection from tax of the land. And so we're only talking about a right that extended to the land. And the land here, there's no dispute that only the Seneca tribe owned the land. And so because only the Seneca tribe owned the land, no individual Seneca member had any ownership interest in the land itself. Then the 1842 treaty therefore only conferred benefits on the tribe because no individual tribe member even owned any of the land. And the protection granted was to protect such of the lands of the Seneca Indians as may from time to time remain in their possession from all taxes until they decide to sell. Of course at the time there was no income tax in the United States. And the only form of taxation that was occurring was with regard to rows or excise taxes for goods brought into the United States at the ports of entry. And your opponents suggest that what one does with these treaties is to look at the general intent. And they suggest that the general intent is to exempt the Senecas as a individual members from any form of taxation. What's your response to that? So my response to that is that the 1842 treaty is unambiguous in that it protects only the land of the Seneca Nation. It clearly doesn't refer to income tax. You have one more minute of your total time. Your Honor, I'm not sure. I think there would have been state income tax at the time. Maybe not a federal income tax. I would want to verify that. It being New York, I'm not willing to debate that with you being in New York myself. And had the intent been to extend this to income tax rather than tax on land, that's something that the parties could have included in the treaty. But it only refers to the land and nothing to do with income derived from the land. So we think that then again the tax court was also correct in holding given the historical context of these treaties that the parties had in mind in the 1842 treaty only the state taxes and not federal income tax. So we think that of course the tax court's decision was correct and should be affirmed for those reasons. Thank you. Ms. Murphy, we'll hear rebuttal. Thank you, Your Honor. First I want to start again with the Canandaigua Treaty. The phrase Indian friends residing and united with the Seneca Nation gave the right to the Seneca Nation to determine who would be made part of their society. And those who are made part of their society would have the free use and enjoyment of their land. The Seneca Nation has this exclusive sovereign right to determine issues regarding that land, including whether the land can be mined, sand and gravel can be sold. They did that here. When we talk about the General Allotment Act, which was in 1887, I think it's important to remember that the Seneca Nation was exclusively excluded from that General Allotment Act. And the reason for that is quite clear. Congress never intended to narrow the rights of the Seneca Nation under the rights that existed in the 1842 treaty or in the 1794 treaty, which was the Canandaigua Treaty. So the reason why, and we don't rely upon the General Allotment Act as to the right, but we look to the General Allotment Act to show how Congress, I'm sorry, how the United States Supreme Court has construed the General Allotment Act. When you look in 1956, the Squire case, the United States Supreme Court found that there was no language in the General Allotment Act that was couched in terms of taxability. But what they did find is that the government, and Justice Wesley, this goes to what you said, the lands under the General Allotment was held by the federal government. So there was no possibility when the court decided the case in 1956 that anybody could put a tax assessment on land that was held by the federal government. But Congress, but the United States Supreme Court and Squire went further. They said the language within the statute that talked about when the fee title would be turned over to these incompetent Indians at the point that they were incompetent, that the general words of charge and encumbrance was enough and sufficient to show an intent regarding the limitation of federal taxation. And you have one more minute. I mean, it was a very paternalistic understanding of the gradual transition from ownership by the nation to individual ownership. And I mean, you'd agree with me, wouldn't you, that the opinion reflects that Congress had this attitude that the danger would be is that if you allowed taxings to attach to it for the activity of, I guess it was timber removal, wasn't it, in the sale? Yes, that's correct. That that would undermine the general purpose of the General Allotment Act, which was to eventually allow individual ownership of land. Well, in reviewing the, I'm sorry. Isn't that what the, I mean, that's really where the, how the court understood the act, wasn't it? I think the court understood the act in the way that they interpreted all treaties. That those promises made to those treaties, that the federal government has a special relationship to safeguard them as wards of the nation and that the same... Your point is that, as I take it, is that the free use and enjoyment and the step out in the San Diego Treaty and the later treaty of 1842 about non-taxability reflects congressional choices or treaty choices ratified by the Congress that the Seneca Nation has a privilege with regard to or control, sovereign control over its land and or that that extends to those that are members of the nation. Correct. That the rights of the Seneca are no different from the rights of its individual members. Exactly, Your Honor. I think that's why they made specific reference in the San Diego Treaty to their Indian friends residing thereon and united with them. I think in the 1842 treaty, if you look at each of the provisions, there were certain rights that were given to individual Seneca. And this notion that the 1842 treaty only dealt with land is, once again, trying to separate these two treaties, isolate the language, and not treat these two treaties together in the series of treaties that have been over 236 years and which are still being enforced by the federal government as not in parallel, not giving the liberal construction that the Supreme Court has suggested and continues to suggest. I also wanted to point out that at all times the Seneca Nation has never been subject to state income tax for Indians who reside and earn income on the reservation, much broader than what we're seeking here. Alice Perkins' revenue was not subject to state taxation. The land, since the New York Indian case in 1866, the state has had no power to impose any state or local taxes on the land. So when we look at this, we're looking at 236 years that not a single case has come before any court where income which was derived from those lands have ever been subject to federal income tax. Additionally, I want to point out to the Court that when it took 140 years before any member of the Seneca Nation was in the United States. In 1924, the Indians Murphy, your rebuttal time has expired, but I had one more question in conclusion. In looking at the reference to Indian friends, can you just explain, because when I look at this provision, the United States will never claim the same, nor disturb the Seneca Nation, nor any of the six nations, or of their Indian friends. It's just as a, and I realize it needs to look at it in context, and I want to make sure I understand the context. I would think if that was supposed to refer to individual members of the Seneca Nation, it would say, or members of the Seneca Nation. And the fact that there's the reference to Indian friends would suggest that it must be referring to members of another nation. So what am I missing in reading it that way? Because it's the Seneca Nation, and the six nations, and their Indian friends. Remember the Haudenosaunee Confederacy, comprising of all six nations, and the clans had a shared relationship. Each of the clans of each of those tribes had a relationship to the same clan in those other tribes. They had the right to come onto their land, they had the right to whatever use and enjoyment of those lands as those individual Haudenosaunee Nations gave. So the reason why they say and their Indian friends, they were referring to anyone who the Senecas would invite onto their territory to be part of their society for whatever purpose. Whether it was the Cayuga Indian Nation when they lost, or were displaced from their sovereign land, or brought onto the territory of the nation. So the reference is to make clear that it's individual Seneca, members of the Seneca Nation, and it's more inclusive than that. It refers to individuals of other nations. Native Americans who are part of the Haudenosaunee Confederacy Mohawks, Cayugas, Tuscaroras, Onondagas, those are the Oneida Nations. And when they came onto the territory of the Seneca Nation, as well as when Senecas went to the territories of those nations. Those nations had the right to give them the free use and enjoyment of those lands as they saw fit, so long as they were united with them. Meaning they followed the customs, laws, and traditions of that Indian Nation. Thank you, Ms. Murphy, that was very helpful. And thank you both for your arguments, very well argued. Thank you, Your Honor.